UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

```
IN RE:                    .    Case No. 24-16273-EPK
                          .
     CAYMAN ISLAND        .    Flagler Waterview Building
     INVESTMENT FUNDS     .    1515 North Flagler Dr., 8th Floor
     MASTER SPC,          .    West Palm Beach, FL  33401
                          .
     Debtor.              .    Wednesday, December 18, 2024
. . . . . . . . . . . . . .    10:13 a.m.
```

TRANSCRIPT OF MOTIONS OF THE FOREIGN REPRESENTATIVE TO COMPEL
PRODUCTION OF DOCUMENTS BY DENNIS KLEMMING FILED BY FOREIGN
REPRESENTATIVES SAMUEL COLE, MITCHELL MANSFIELD [47, 59]

BEFORE THE HONORABLE ERIK P. KIMBALL
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For Dennis Klemming:      Akerman LLP
                          By:  DAVID B. MARKS, ESQ.
                          201 E Las Olas Blvd.
                          Fort Lauderdale, FL  33301


For Alliance Metals,      Stok Kon and Braverman
LLC, et al.:              By:  THOMAS SANDLER, ESQ.
                          90 Woodbridge Center Drive, Suite 900
                          Woodbridge, NJ 07095


For Samuel Cole and       DLA Piper LLP (US)
Mitchell Mansfield:       By:  NICOLE McLEMORE, ESQ.
                          200 South Biscayne Blvd., Suite 2500
                          Miami, Florida  33131-5341

                          DLA Piper LLP (US)
                          By:  CRAIG MARTIN, ESQ.
                          1201 North Market Street, Suite 2100
                          Wilmington, Delaware  19801


Audio Operator:           Dawn Leonard

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311       Fax No. (609) 587-3599**

1           COURTROOM DEPUTY:  Okay.  Next we have Cayman

2    Investment Funds Master SPC, Case Number 2416273.

3           Mr. Marks.

4           MR. MARKS:  Judge, good morning.  Brett Marks with

5    Akerman Senterfitt on behalf of Dennis Klemming.

6           THE CLERK:  Mr. Sandler.

7           MR. SANDLER:  Good morning.  Theodore Sandler on

8    behalf of Alliance Metals, Technocon International, Inc., Sinai

9    Holdings, LLC, Athena Medical Management Group, LLC, Jacob

10   Gitman, and Ariel Gitman.

11          THE CLERK:  And in the courtroom.

12          MS. McLEMORE:  Good morning, Your Honor.  Nicole

13   McLemore, DLA Piper, on behalf of Samuel Cole and Mitchell

14   Mansfield of Kroll Cayman Limited, the joint official

15   liquidators and foreign representatives of the Chapter 15

16   debtors.

17          I'm joined today in the courtroom by my colleague,

18   Mr. Craig Martin of DLA Piper's Wilmington, Delaware, office.

19   And we also have on the virtual platform, client

20   representatives from Kroll.

21          THE COURT:  Very good.  Good morning.

22          MR. MARTIN:  Good morning.  Nice to see you, Your

23   Honor.

24          THE COURT:  Very well.  So it's yours.

25          MS. McLEMORE:  Thank you, Your Honor.  With the

1  Court's permission, I'd like to cede the podium to Mr. Martin

2  to present the motions to compel.

3            THE COURT:  Sure.  Of course.

4            MS. McLEMORE:  Thank you.

5            MR. MARTIN:  It's nice to see you again.  I think

6  it's been about six months.

7            THE COURT:  Six months.

8            When was the last hearing?

9            MR. MARTIN:  Well, the last hearing was in June.  And

10  I thought this might present a nice opportunity for me to give

11  the Court a brief update.

12            THE COURT:  Sure.

13            MR. MARTIN:  And then we have two motions.  One is

14  with Mr. Marks, who is new to the case.  And I think we've met

15  and conferred with him.  And we'll be able just to present that

16  as a status conference.

17            And then we have a motion to compel against

18  Mr. Sandler's clientele, which he has filed a opposition to.

19  And with the Court's indulgence, I suspect we will want to

20  argue that.  We don't have a resolution on that.

21            THE COURT:  Okay.  Go ahead.

22            MR. MARTIN:  So just to update Your Honor, these

23  cases, these Chapter 15 cases were filed.  You may recall, we

24  had a hearing related to a state court proceeding that was

25  pending regarding a security interest.  The result of the

1 hearing was that Your Honor recognized these cases as foreign

2 main proceedings and provided some guidance from the bench on

3 how Mr. Sandler and myself might deal with the state court

4 litigation.

5       Since that time, our client did, in fact, withdraw

6 its motion to intervene and withdraw from that litigation,

7 which, based on my review of the docket, not being any longer

8 involved, I understand, has come to conclusion and has been

9 closed.

10       THE COURT:  What was the conclusion, if you know?

11       MR. MARTIN:  I believe a default judgment was entered

12 against CT Corporation, the named defendant, and that the state

13 court ordered that the UCC-1 that was on file be expunged from

14 the Secretary of State's records.

15       THE COURT:  Are you able to illuminate me why the

16 motion to intervene was withdrawn?

17       MR. MARTIN:  Your Honor, we evaluate, obviously,

18 being liquidators, we come to the situation as we find it, and

19 so we had a UCC filing.  Based on the records that we had

20 available to us and some of the issues that Your Honor

21 identified, there appeared to be a difference between the

22 signatory to our loan documents and the named party on the

23 UCC-1.  And balancing the legal issues that had been raised and

24 the expense of fighting those and the likely outcome, which I

25 think Your Honor picked up on, we decided to withdraw from that

1   and not incur any further expense.

2          And so we then turned to the next task before the

3   official liquidators, which is continuing to try to investigate

4   the situation that they have found themselves in and whether

5   there might be assets to recover, and that has resulted in the

6   discovery that has been served, the 2004 subpoenas.  There are

7   two groups there.  Mr. Klemming, who was the founder of these

8   businesses and who ran the investment managing company.  And

9   then, there are the Gitmans, who Mr. Sandler represents, have

10  more than Alliance Metals, which is the company we were dealing

11  with originally before, Your Honor, but there is the other

12  companies that we served the 2004 subpoena on, the Sinai

13  Medical and the Athena entities.

14         So having served those 2004, I think hopefully Your

15  Honor has had the opportunity to look at the papers.  We have

16  had both written correspondence regarding the discovery.  We've

17  had several meet and confers, both with Mr. Klemming before he

18  hired the Akerman firm and with Mr. Sandler and his colleague,

19  Mr. Kon, and we have sought to limit the discovery to be

20  reasonable, to negotiate terms, and in some instances, that has

21  borne some fruit and in some it has not.

22         So that's what we've been doing since we were last

23  before Your Honor.  Unless Your Honor has any questions, I'll

24  turn to the matter related to Mr. Klemming, which is ECF

25  Number 47, a motion to compel production.

1   Fortunately, Mr. Klemming did decide to hire counsel,
2  so we did have a good meet and confer with Mr. Marks last week.
3  He actually asked if we would put this off another 30 days.  I
4  think, though, he appreciates that we've been pursuing these
5  records for quite some time, including before the case was
6  filed, since Mr. Klemming was the one that ran these businesses
7  and since we filed these cases.

8   But based on assurances from Mr. Marks that he will
9  keep us up to date on a weekly basis, that he will work with
10 his client to search the documents, including electronically
11 stored information, we've had some meet and confer over the
12 electronically stored information with Mr. Klemming.  He's
13 proposing to, I think, bring in someone that he thinks might be
14 able to assist with that.

15   Mr. Marks has identified that his firm has the
16 capacity to assist should that individual not be able.  So
17 those assurances from Mr. Marks, and obviously knowing the
18 reputation of his firm and relying on him as counsel, we had
19 agreed that we would say all of this to you, that he would
20 affirm it, and that we would then carry this forward for
21 whatever time period is appropriate.

22   Obviously, our client has a sense of urgency because
23 of the frustration and the time that has passed.  So two weeks,
24 but I know it's the holiday season, so if we need another
25 month, I would not pound the table and object to that.

1          THE COURT:  Mr. Marks.

2          MR. MARKS:  Thank you, Your Honor.

3          We did just get retained to represent Mr. Klemming,

4  and we have spoken with him concerning the subpoena that was

5  served.  I think from his vantage point, I want to point out

6  one thing.  He produced already a voluminous amount of

7  documents to the liquidator.  I was thumbing through a Dropbox

8  that was provided to counsel for the liquidator, which includes

9  25 different envelopes full of records pertaining to all the

10 business interests of the Chapter 15 debtor.

11         And inside those envelopes, there's thousands of

12 pages of documents that have been produced.  So I don't want

13 you to think that Mr. Klemming has been hiding the ball in any

14 of this.  The bigger problem is is that they want to search

15 through his laptop, and Mr. Klemming was not only the principal

16 of this Chapter 15 debtor, but he's also the principal and had

17 business interests in several other entities unrelated to this

18 Chapter 15 proceeding.

19         So trying to gather whatever he has on his laptop and

20 isolating out what's relevant and specific to Cayman Islands

21 Investment Funds Master has been a little problematic.  That,

22 and you couple it with the search terms that were provided,

23 some of them are certainly specific.  Some of them are a little

24 more ambiguous when the search term is "audit" or "board" or

25 the name "Allen" or "$100 million."  So my team is working with

1  his IT professional, and we're going to take all the search
2  terms, we're going to go through his laptop, we're going to see
3  how many hits that we have on his laptop, and we will be
4  providing counsel for the liquidator periodic reports.  And we
5  will endeavor to get him whatever we can that is relevant, not
6  privileged, though I'm not sure that there would be in this
7  instance, given the liquidator steps into the shoes of the
8  company.  But we are working on this.

9          I do have a team together that's working with
10 Mr. Klemming on this.  He does have an outside person that he's
11 using.  If that doesn't work, we'll bring in my IT team to
12 handle it.  And I do expect to provide a more fulsome response
13 and additional documents to the counsel for the liquidator
14 within the next 30 days.  So I would ask that you roll this for
15 30 days, allow us to see if we can't get them what they need.

16         THE COURT:  Well, Ms. Leonard, what could we offer
17 them in any case?

18         THE CLERK:  Over to the motion calendar?

19         THE COURT:  Yeah.

20         THE CLERK:  We can go to the 26th, February.

21         THE COURT:  Gentlemen, February 26th?  I realize
22 that's a long ways from now.

23         February?  Did you say February?

24         THE CLERK:  Oh, sorry.  January.

25         THE COURT:  January.  Don't say February.

1          January was completely filled, but <u>Miss America</u> is
2    now gone.
3          THE CLERK:  January 28th.
4          MR. MARTIN:  January 28th.
5          THE CLERK:  28th, yeah.
6          THE COURT:  Okay.  January 28th, afternoon, correct?
7          THE CLERK:  Yes.
8          THE COURT:  Let's do it in the --
9          THE CLERK:  Afternoon.
10         THE COURT:  Let's do it in the afternoon.
11         What time?
12         THE CLERK:  It's up to you.  We can do 1:30 or two
13   o'clock, whichever you would prefer.
14         THE COURT:  Well, let's put it at 2:00.
15         THE CLERK:  Okay.
16         THE COURT:  Yeah.
17         All right.  So we'll re-notice.  That's 47.  I
18   realize that's more time than you wanted.  Yes, we don't have
19   motion calendars the next couple weeks.  When is our first
20   motion calendar after?
21         THE CLERK:  The 8th.
22         THE COURT:  The 8th of January.  That might be too
23   soon, given what's happening.  Mr. Marks is nodding yes.
24         I know you feel under some pressure, but I have a
25   funny feeling, given your communications, that you'll be

1  getting things in the meantime.

2          MR. MARTIN:  Yes, I hope so.

3          MR. MARKS:  Yes.

4          MR. MARTIN:  And I don't think, in light of our

5  discussions, obviously, we'll just reserve our rights on the

6  quantity --

7          THE COURT:  Of course.

8          MR. MARTIN:  -- produced and whether anything would

9  be privileged or not.  But we do feel comfortable working with

10  Mr. Marks.  And while my client might kick me under the table

11  for not jumping on the 8th, I understand the Court's docket and

12  the calendar and the holidays.

13          THE COURT:  Well, I just -- the 8th sounds like a

14  long time from now, but given this time of year, my experience

15  is it's not, and you'll be back on the 8th and tell me that

16  you're not done.

17          MR. MARTIN:  Right.

18          THE COURT:  And I think that the odds of you being

19  more likely to be done will be at the latter date, and I think

20  that might be helpful to you.  If you told me that Mr. Marks

21  was being impossible, then I might set it earlier.

22          MR. MARTIN:  Okay.

23          THE COURT:  And just have more hearings.

24          MR. MARTIN:  Well, I'm certainly inclined to give him

25  time.  And it sounds like Your Honor is, so I won't push back

1  further on that.  And if he gets impossible, we'll have an

2  exciting hearing on the 28th.

3          THE COURT:  Well, let me give you -- if you think

4  that things are not moving along, you should ask for a hearing

5  in the meantime.  Because what I normally do on disputes such

6  as this, for example, in one of these, you have a lengthy table

7  that shows me what's been requested, what's been received, and

8  the like.  I'll set a separate day just for whatever it is and

9  go through the request one at a time.

10          And the longest one I had was eight hours.  And by

11  the way, I award sanctions for every single request, one at a

12  time, monetary sanctions, one at a time.  So if we have to do

13  that, I'll set it, and I'll set it in the meantime.  So if

14  nothing's happening, you let me know.

15          MR. MARTIN:  Okay.

16          THE COURT:  Okay.

17          MR. MARTIN:  I appreciate that, Your Honor.

18          THE COURT:  I think the odds of that are slim.

19          MR. MARTIN:  I think so.

20          THE COURT:  All right.  So we have that one.  Regular

21  electronic notice, Ms. Leonard.

22          MR. MARTIN:  Yeah.  So that then takes us to our next

23  one, which is the motion to compel.

24          We filed this as more of an omnibus one, not because

25  we really wanted to treat this as a discovery dispute.  It

1  sounds like we might get there if we need to.  We didn't seek
2  sanctions.  We didn't seek contempt.  Because we really view
3  this as more of a theoretical discussion about the obligations
4  of the parties that we've served subpoenas on, especially in
5  light of their opposition.

6         But as a general matter, I'll call these the
7  borrowers.  So these entities are the ones that have signed
8  some type of a loan agreement with the foreign debtor entities.
9  And those loan agreements are very similar to the one that you
10 looked at before.  They're just with different companies.

11        And so we did serve a 2004.  We did not receive
12 within the 14-day period any response or objection.  And we did
13 agree to extend the production time period several times.

14        THE COURT:  And in each instance, that was requested
15 by Counsel?

16        MR. MARTIN:  Yes, that's correct.  And as I
17 understand it, Mr. Sandler and Mr. Kon represent all of the
18 borrower entities, whether they're individuals or entities.  So
19 we've only been dealing with them.

20        They did not file a motion to quash or seek
21 protection.  And we did have some minor meet and confer over
22 the electronically stored information.  I think the outcome of
23 those meet and confers was that they did not think it was
24 necessary and that they could simply do manual searches of the
25 records, and we did include within our filings a letter

1  response that we received from them on November 1st certifying

2  that their client had searched some records and that they had

3  produced to us what the client had provided and their statement

4  that they had admonished their client to do a thorough search.

5  But from our view of the situation and the dockets that we

6  would have expected in light of the relationship, we found the

7  discovery to be insufficient.

8          For that reason, we filed the motion to compel.  And

9  as I mentioned, we're not really seeking a tough remedy,

10  sanctions, contempt.  We're really seeking clarity to these

11  parties that they are, in fact, obligated to --

12          THE COURT:  To respond.

13          MR. MARTIN:  -- to comply with the subpoena.

14          So that's the approach that we took and I hope that

15  Your Honor feels from the review of both the correspondence,

16  and we have been on the telephone with them a number of times,

17  that the foreign representatives have acted in good faith and

18  been reasonable over the almost four-month period that these

19  subpoenas have been pending.

20          Now, I think Monday night, there was a response or

21  objection at Docket 63.  As I review that, I see that there are

22  basic three themes and I have a couple of responses to each of

23  those themes.

24          The first one is is that we are engaged on a fishing

25  expedition that is overly broad and that to the extent that

1  Your Honor were to permit it, we should be charged with paying

2  the cost of the discovery.  There's an argument that under the

3  pending proceeding rule that this discovery should be dismissed

4  and/or we should be required to file adversary proceedings to

5  serve this discovery in.

6          And then there's something that I will refer to as

7  boomerang discovery, and that's a term that comes out of a

8  Judge Mark's decision that I'll mention to Your Honor that I

9  think it's relevant to the objection raised.

10          THE COURT:  Do you mean my colleague Judge Mark?

11          MR. MARTIN:  Yes.  Yes.  In a published decision.

12          THE COURT:  I have to tell him he's coined a new

13  phrase.

14          MR. MARTIN:  Well, according to the decision, it was

15  coined by the foreign representatives counsel, which was not

16  me, in their briefing, but he adopted it in the -- and it's now

17  made its way into various commentary and treatises.

18          THE COURT:  How recent is this?

19          MR. MARTIN:  2019.

20          THE COURT:  Okay.

21          I was just trying to figure out which law clerk to

22  give credit to.

23          MR. MARTIN:  Fair enough.

24          On the fishing expedition, I would start with the

25  fact that there were not timely filed objections.  I would also

Case 24-16273-EPK    Doc 66    Filed 12/20/24    Page 15 of 44

15

1 note that there is a basis for our request.  The foreign

2 representatives are seeking to determine whether there are

3 assets available, how the fund operated.  My colleague,

4 Ms. McLemore and I were talking this morning.  It's as basic

5 for us and them as figuring out the corporate chart, the

6 various parties that were involved because they, like a

7 Chapter 7 trustee, come to this situation without having been

8 involved in the funds.

9        And over the course of their investigation, they've

10 learned a lot, but they still feel that they need to learn some

11 more, and that's what they're seeking to do.  And the main

12 complaint seems to be that we asked for too many bank

13 statements and that what we should do is go to the banks rather

14 than get it from these borrower discovery targets.

15        And I would simply say that while they did provide

16 some bank information, which was initially redacted and then

17 when we asked for it to be unredacted, they unredacted it.

18 Based on our other investigations, we were aware that these

19 borrower targets did have significant bank accounts and the

20 reason that is relevant is because the various loan documents

21 granted as security pledged accounts receivable and directed

22 that those accounts receivable be deposited into specified bank

23 accounts.

24        And so the fact that these various entities have so

25 many bank accounts, we do feel that we need the records.  And

1 from the foreign representative standpoint, it's more efficient

2 for us to obtain it from the owner of the bank accounts than

3 have to subpoena the multiple banks.

4        THE COURT:  There are also other reasons to obtain

5 the records directly from a potential defendant rather than a

6 third party.

7        MR. MARTIN:  Yes.  Yes.  I agree with Your Honor on

8 that.

9        So for those reasons, I would submit that the fishing

10 expedition contention is not one that would justify any type of

11 relief for the targets of the subpoenas.

12        Briefly touching on a component that I think they

13 would put in that category is the electronically stored

14 information.  They did put in place a declaration of Mr. Kon

15 who submits, and as they do in their briefing, that the cost

16 would be extensive.  And looking over his declaration, he does

17 not say that they have solicited cost proposals.  He simply

18 refers to an average cost for a certain number of record

19 keepers, sets forth the number of record keepers that they

20 have.

21        I do want to let the Court know that obviously the

22 joint liquidators are affiliated with Kroll which is a firm

23 that's quite sophisticated in electronically stored

24 information.  We did offer to assist with our internal

25 discovery.  That was rejected.  So if the cost were to be

1  shifted to us, our idea would be we have the ability to have

2  the electronically stored information downloaded into Kroll

3  systems.  I could certainly understand that my opposition on

4  the other side of the bar may say, well, wait a second.  We

5  don't want to download all of these records into your

6  relativity database.

7          But to the extent that the Court feels that they've

8  put forth a compelling basis that the cost is too sufficient,

9  is too high for them, and it would be burdensome, we would be

10  willing to work with them to create a mechanism where we can

11  capture the data, give their counsel the ability to sift

12  through it electronically.  That way, you can tag documents,

13  and it can be excluded from our view.  And we would be willing

14  to engage in a discussion to establish that protocol.

15          That said, the local rule does require electronically

16  stored discovery.  2004 and Rule 45 now both have provisions

17  that provide that it should be considered a component of

18  responsive documents.  So, obviously, my initial position is

19  that they should be obligated to produce that information.  And

20  if they want to make a cost issue, then I think that's

21  something that we might need to discuss further or come up with

22  a mechanism for us to resolve.

23          And that may not be a today conversation, but I did

24  want to let the Court know that we had briefly talked on that

25  and made that offer to them.  It had been rejected.  And the

1  cost issues that we saw in the declaration, I'm reacting to
2  today, but they had not necessarily formed a big part of that
3  earlier discussion.

4              THE COURT:  In your motion, the request for relief at
5  the end of the motion suggests that there are alternative forms
6  of relief.  One is simply an order compelling response, period,
7  without regard to how that's accomplished.  And then, in the
8  alternative, a specific request that I order that an ESI vendor
9  be retained.

10             MR. MARTIN:  Yes, and --

11             THE COURT:  Is that how you're --

12             MR. MARTIN:  -- we were actually talking in the car
13  today about that because Ms. McLemore was working on the order
14  and I suspected that if Your Honor is going to enter an order,
15  you want to know what you're ordering people to do.  So,
16  certainly, we want there to be an order requiring production of
17  the documents we've requested.  On the ESI, at the time we
18  wrote the motion, we had had discussions with them about
19  complying with the ESI directives and that would normally
20  require that they identify someone internally that can respond
21  to it or hire an external vendor.

22             They had indicated to us on the meet and confer that
23  they did not have the capacity in-house to do it.  And so
24  that's why we requested the vendor approach in the motion.
25  Now, obviously, since we filed the motion in opposition,

1  they've raised a cost issue.  And so that's why I wanted to let
2  the Court know that, in discussing the external vendor, we have
3  offered that Kroll has resources that could assist them.

4          That was not in our motion, so to the extent that you
5  were inclined to not just order them to hire one due to the
6  cost issues or you wanted to explore that further, I would be
7  willing for a remedy that required a very short time frame to
8  meet and confer and come up with a way to comply with the ESI
9  directives.  And that if we are not able to do so, that we more
10 sharply present that issue to Your Honor based on those
11 discussions.  I think that would be a reasonable and fair
12 approach.

13         The final issue is the one that -- not the final
14 issue.  The second theme that they raise is the pending
15 adversary proceeding, and they make reference to the case that
16 I mentioned in my introductory update which, based on my review
17 of the docket, has closed.  And that case is no longer pending.
18 And I think that they acknowledge that in their opposition
19 because they say that when it was pending, we should have
20 sought discovery in that case.

21         That situation was Alliance Metals, LLC.  As
22 mentioned in my introductory remarks, and Your Honor probably
23 recalls from the last time, our loan agreement was with a
24 company called Technocon, doing business as Alliance Metals,
25 and not the Alliance Metals, LLC.  So I suspect that had we

1  served discovery in that matter, similar to the 2004 matters,
2  we would have been met with motions to quash and a state court
3  judge saying, why are you serving all this discovery in this
4  relatively narrow, discrete instance?  So I don't really think
5  that that's a plausible basis to deny the relief that we've
6  requested.

7          I would also say that our discovery requests are much
8  broader.  And I don't think that the solution is to have us
9  file adversary proceedings.  Obviously, part of the discovery
10  is for the joint official liquidators to determine the facts
11  and circumstances of this business and whether they do in fact
12  have rights or claims that they could assert so that if they're
13  going to incur expense in asserting those, they have not only a
14  good faith basis for the complaints that they might file but
15  they can say to their creditors and the Cayman court that the
16  expenses they incur are justified.

17          So I think that the idea that we should increase
18  process, increase more lawsuits, dismiss the 2004, and then
19  start the discovery over is something that would be prejudicial
20  to the joint official liquidators and we would ask that the
21  Court provide us with the assistance that is contemplated in
22  Chapter 15 and authorize the discovery that we've requested and
23  not reject it on the pending adversarial proceeding argument.
24          THE COURT:  Well, the discovery is already
25  authorized.  You're simply --

1          MR. MARTIN:  Yes.

2          THE COURT:  -- asking for a further order enforcing

3 the request previously made.

4          MR. MARTIN:  Yes.  Yes.  I agree.  Under 1521, we

5 have the right to seek discovery and examine witnesses.  Under

6 the local rules, we can issue the 2004 subpoena without further

7 order.  So I agree with that.

8          Let me turn to the last issue because it is amusing

9 that it's called boomerang discovery, but I'll explain why

10 because you may have picked up in the opposition that their

11 response was, well, we're not going to respond to discovery

12 that you've served on us until you respond to discovery that

13 we've served on you.  And the history behind that is is that in

14 our meet and confers, we had asked for a final response of

15 December 6th to respond to some of the issues that we had

16 raised, the long letter that Your Honor mentioned where we had

17 consolidated all of the discovery disputes into a single place.

18 That was Exhibit I in the record.

19          And we received in response the subpoena that asked

20 for a deposition and document production.  And many of those

21 discovery requests mirror those that we have made, and so in a

22 case -- I'm probably going to mess it up, so I'm going to spell

23 it so that if this gets transcribed, the typist will be able to

24 spell it properly.  But I think it is In re Viacao Itapemirim,

25 which is V-I-A-C-A-O, second word, I-T-A-P-E-M-I-R-I-M.  And

1  that is, as I mentioned, a decision by Judge Mark from October

2  of 2019, published in the official reporters at, 607 B.R. 761.

3         And the reason he called that boomerang discovery and

4  referenced the briefing on that is that, in this case, much

5  like our case here, there had been discovery served by a

6  foreign representative on discovery targets looking into

7  various issues that the foreign representative wanted to

8  investigate.  In response, those targets served back discovery

9  on the foreign representatives in which a large portion of the

10 requests were identical to those that had been served upon

11 them.

12        And I think if you were to look into the subpoena

13 that was served on us, you'll see that there's similar

14 duplication.  Although, I know you don't have to decide that

15 today because we have not responded to that.  We do intend, if

16 we're unable to resolve it, to move for protection or to quash

17 it.

18        But the interesting thing is is that there was an

19 initial discussion by Judge Mark of whether under 521(a)(4),

20 anyone other than the foreign representative can even take

21 discovery in a Chapter 15.  He, however, determined that he did

22 not need to make that determination and decide that legal

23 issue, and there is some debate in various courts about whether

24 only a foreign representative can serve discovery or whether

25 the foreign representative can be subject to discovery.

1           THE COURT:  Outside of an adversary proceeding.

2           MR. MARTIN:  Yes.  So, for example --

3           THE COURT:  I mean, I'm just clarifying.

4           MR. MARTIN:  Yeah.

5           THE COURT:  In an adversary proceeding, if the

6  foreign representative is the plaintiff --

7           MR. MARTIN:  Yes, of course.

8           THE COURT:  -- obvious -- or the defendant --

9  obviously, there will be discovery.

10          MR. MARTIN:  Yeah.  And there's Bankruptcy Rule 1018,

11 which says, "In connection with recognition, the foreign

12 representative," and then there's some cases that talk about

13 adversaries and contested matters.

14          Judge Mark's decision is a 2004 request, similar to

15 the one we received.  But he decides that rather than wade into

16 this debate under 1521(a)(4), he decided he didn't need to do

17 that because, in order to be able to serve discovery,

18 generally, under 2004 in a Chapter 15, you have to demonstrate

19 that you have standing based on a pecuniary interest.

20          And in my experience, if you were to establish that,

21 Judge Mark finds that this party did not have a pecuniary

22 interest.  But even if you did have that, if you were just

23 seeking discovery to assert a claim in the foreign proceeding,

24 I've been involved in cases where judges say, if you want to

25 assert a claim in the foreign proceeding, go assert one in the

1  foreign proceeding.  It's not my job to decide the claims

2  process in --

3          THE COURT:  Okay.  I'd like to cut this short.

4          MR. MARTIN:  Yes.

5          THE COURT:  The discovery served against the

6  petitioners is not before the Court today.

7          MR. MARTIN:  Certainly.

8          THE COURT:  In my view, it has no impact on the

9  motion that I'm hearing at this time.

10          MR. MARTIN:  I agree with you, and that was going to

11  be my point, which is the fact that they've served a subpoena

12  on us, does not --

13          THE COURT:  I don't care.

14          MR. MARTIN:  -- justify their non-compliance with the

15  one I --

16          THE COURT:  It's unrelated.

17          MR. MARTIN:  -- served on them.

18          THE COURT:  Well, it's unrelated unless there's a

19  sanctions request, and there is not, and I have no motion to

20  compel on that presently.  So I don't intend to hear it today.

21          MR. MARTIN:  Okay.  Thank you, Your Honor.

22          Because they did include that in their opposition,

23  that's the main --

24          THE COURT:  I saw it.

25          MR. MARTIN:  -- reason why I addressed it, but that's

1  my presentation to the Court, and I'm happy to answer any
2  questions or sit down and let Mr. Sandler respond.  And if you
3  want to hear from me further, I'll be in your hands to guide me
4  if you do or don't.
5          THE COURT:  Thank you.
6          Mr. Sandler.
7          MR. SANDLER:  Good morning, Your Honor.  Again,
8  Theodore Sandler on behalf of -- I'll just call the examinees
9  for ease of reference, if that's acceptable.
10         THE COURT:  Sure.  Yeah, of course.
11         MR. SANDLER:  So first off, just by way of
12  background, I would like to explain to the Court that we
13  believe our production was substantial.  I recognize that the
14  summary of what was filed with the motion to compel paints, or
15  at least tries to paint a different picture.  I mean, we did
16  produce two productions.  Again, I think thousands of pages, as
17  well, bank statements, taxes, insurance, emails.
18         And, as we've said in our motion and through our
19  conferrals, it was done manually because my firm's not equipped
20  to do ESI in what's being sought -- of the nature being sought
21  in the motion.  And that, in some ways, dovetails to our
22  objections and our response to the motion to compel.
23         So, first, with respect to the timeliness argument
24  that under Rule 45, we had to make timely objections, we did
25  seek extensions ahead of the deadlines.  I recognize that that

1  objection should have been made prior to the deadline, but

2  these objections are not in the nature of what I call

3  traditional litigation objections in terms of relevance, or

4  lack of definition of terms, et cetera.

5          It was more of what I'd call global objections, which

6  was that Rule 2004 was not an appropriate mechanism for this

7  discovery and the costs.

8          THE COURT:  Well, why would your own deadlines not

9  apply to global objections as well?  I don't understand why you

10  would differentiate.  I mean, you asked for an extension.  I

11  believe the most recent one was the 16th of September.  And as

12  far as I can tell, the objections raised now are raised in the

13  response filed at ECF 62, which was three months later.

14          MR. SANDLER:  Your Honor, we raised the objections in

15  our initial responses.  I didn't file them with the Court.

16  Those were served on the foreign representatives at the

17  original deadline that we had.  I mean, no.  It was not the

18  original deadline, the first extended deadline.

19          THE COURT:  So all of the issues raised in your

20  response before the Court today were raised in timely documents

21  served on the foreign representatives.

22          MR. SANDLER:  Timely.  It wasn't served by the

23  original deadline, but it was served -- not after -- it was

24  served before our initial meet and confer.  In other words, we

25  got one extension.  I believe that pushed out about a month.  I

1 mean, I don't have the exact analogy in front of me, but we

2 served it then.

3          THE COURT:  All right.

4          MR. SANDLER:  And there was --

5          THE COURT:  Well, according to the motion before me,

6 the original deadline was September 3, and it was extended

7 twice to the 10th and 16th of the same month.  Is that

8 inaccurate?

9          MR. SANDLER:  Right.

10          THE COURT:  Okay.  And so, there was a formal

11 response before September 16th that contained all of the

12 objections raised in ECF 63, which I'm considering today?

13 That's a --

14          MR. SANDLER:  So --

15          THE COURT:  That's a question.

16          MR. SANDLER:  Right.

17          September 16th.  I mean, I would have to check my

18 exact emails, but that was the time when we served our

19 responses, and those the responses contained objections

20 objecting to the 2004 and what I'd call kind of the breath and

21 financial objections.

22          THE COURT:  All right.  Well, let's assume that

23 that's the case, and then I'll hear the remainder of the

24 matters, the substantive components of your objection.

25          Do you agree with Counsel's concept that there are

1  really three primary arguments?

2           MR. SANDLER:  Yes, Your Honor.

3           THE COURT:  Please.

4           MR. SANDLER:  Okay.  So first, addressing the pending

5  proceeding rule.  So with respect to Alliance and Technocon, we

6  would submit there was a pending proceeding, and by

7  stipulation, we allowed --

8           THE COURT:  Are you --

9           MR. SANDLER:  -- the debtors to --

10          THE COURT:  Mr. Sandler, are you aware of any case --

11 you properly cite the concept that there needs to be a pending

12 contested matter or adversary proceeding, I will point out

13 those are terms of art, for there to be the so-called pending

14 proceeding rule to apply.  Are you aware of any bankruptcy case

15 that rules that a matter pending in another venue, a state

16 court, a different federal court, not under bankruptcy

17 jurisdiction, would merit application of the pending proceeding

18 rule in the context of a Rule 2004 examination?

19          MR. SANDLER:  I did not research that specific issue,

20 Your Honor.  But to the extent the debtor would have intervened

21 in that case, I mean, it certainly would have become a related

22 matter.  I would --

23          THE COURT:  Okay.  Let's say there is an actual

24 pending state court matter, it's still pending, the one that

25 you're referencing, and the motion to intervene was not

1  withdrawn, it was in fact granted, and the petitioners are

2  active in that case.  Are you aware of any bankruptcy decision

3  that says that is a pending proceeding for purposes of

4  Rule 2004?  An action in another court?

5          I'm not.  That's why I'm asking the question.

6          MR. SANDLER:  I'm not specifically.  I've been

7  involved in cases where those arguments were raised.  I didn't

8  specifically research this or brief it.

9          THE COURT:  Okay.  Even if a proceeding in the

10  Florida state court on one component of one claim that might be

11  pursued in connection with this bankruptcy proceeding would be

12  considered a pending proceeding, which in my view it is not

13  because it is neither an adversary proceeding nor a contested

14  matter, which by definition are things directly associated with

15  this Chapter 15 case.  Even if it was, it is not pending.

16          And so they have no -- just because they could have

17  intervened and might have sought discovery on potentially part

18  of what is being addressed in this particular motion would not

19  be sufficient to deny the motion before the Court.  So I'll

20  overrule that component of the objection.

21          Next issue.

22          MR. SANDLER:  Okay.  If I may just elaborate a little

23  more on that first issue, which was --

24          THE COURT:  I'm done with that issue, Mr. Sandler.

25          MR. SANDLER:  Okay.

1          THE COURT:  One would think that the word pending
2    would apply to something that exists.  There is no pending
3    action.  So there are several reasons why the pending
4    proceeding rule does not apply here.  I've already outlined
5    them.

6          One, there is no pending action.  Two, even if there
7    was a pending action, it's not a pending proceeding within the
8    pending proceeding rule because it's neither a contested matter
9    nor of an adversary proceeding.  And three, even if those two
10   hoops were jumped through, there would be an additional hoop
11   and that is that the nature of the discovery allowable in that
12   action would be quite slender and would be nowhere near the
13   discovery that might be applicable under Rule 2004 in this
14   Chapter 15 case that the Court has recognized in connection
15   with the main proceeding.

16         So three different reasons why that's overruled.  One
17   legal, the other related to the specific facts of this case.

18         So next argument.

19         MR. SANDLER:  Okay.  So moving on to -- and just --
20   I'm sorry.  The second argument, the way Counsel presented it,
21   is with the, we'll call it the ESI or cross-shipping
22   (phonetic).  So, again, this is an objection with respect to
23   timeliness, again, Your Honor, under Rule 45(e)(1)(D) is the
24   rule.  These objections are raised on motion to compel.  So we
25   do think, first of all, we raised it earlier and we've now

finally raised it in response to the motion to compel.

And our conferrals, we did discuss ESI.  At that time, we explained that our firm and our clients are not set up to do ESI.  I don't recall the specific offer of the debtors coming in and doing the searches.  I might be wrong on that. But, I mean, potentially that wouldn't resolve our objection.

It's something we'd have to discuss with our clients. But the point is, as Mr. Kon has set forth in his declaration, to the extent the Court wants evidence, I would proffer that declaration.  I can get Mr. Kon here.  I don't know if it's -- if the Court needs --

THE COURT:  Well, I've read the declaration, and what it says is, in his experience, in a small matter, the cost would be $10,000.  It's essentially an expert testimony statement.  And as you can probably imagine, the Court has a lot of experience with costs in connection with ESI because trustees and debtors-in-possession must regularly retain such companies and make payments.

There are a whole bunch of issues that the Court would need to consider if the argument is that the cost is prohibitive.  One would be, who are your clients and what is their ability?  Two would be, what is the extent of the discovery?  For example, in your response, you complain that there are 96 bank accounts.  This is just one thing.

My reaction to that was, if you have 96 bank

1  accounts, one would think that you have the ability to pay for

2  responding appropriately to discovery.  Generally, penniless

3  companies don't have 96 bank accounts.  So I'm not particularly

4  enamored of that argument.

5         And, as Counsel pointed out in his presentation, and

6  this was my first reaction to Mr. Kon's affidavit, it does not

7  say that we have obtained a bid or bids in connection with the

8  potential work, and this is in fact what it will cost.  It

9  said, based on my experience.  I'm not necessarily willing to

10 accept him as an expert witness in connection with that

11 affidavit.  So I'm giving very little weight to that affidavit,

12 Mr. Sandler.

13        Now, the proposal made by Counsel in his presentation

14 on the motion was to suggest that there was a way for the firm

15 associated with Counsel representing the petitioners to

16 undertake and assist in the ESI production in a manner that

17 would not give Counsel to the petitioners direct access to the

18 data globally.  And perhaps that can be arranged.  That's

19 something you can discuss most likely after today.  I would not

20 order that up front.

21        But it certainly sounds like a way to avoid

22 additional expense to your clients.  If the matter is expense,

23 which I have a funny feeling it is not, then I'm sure there are

24 ways to get around that.  So cost, I'm not going to determine

25 that issue today.  I'd likely direct you to further discussions

1  and have an additional hearing.

2          So the next argument, Mr. Sandler.

3          MR. SANDLER:  Yeah.  So the next argument, and

4  recognizing the Court's previous comments that our subpoena

5  is -- it's not really a subpoena, it's our notice is not before

6  the Court.  Notwithstanding, Your Honor, I do think we have

7  rights to understand where a lot of these requests are coming

8  from.  We haven't been --

9          THE COURT:  When the estate representative serves

10  somebody with a Rule 2004 exam notice or request for documents,

11  it is not an appropriate objection to say, you need to explain

12  to us what your theory is or what evidence you already have.

13  That would happen if an action is brought.  You can object on

14  the basis that it is beyond the scope of Rule 2004, which I

15  think is an argument you have made.  But it is not an

16  appropriate response to the request for documents to say, until

17  you tell us what you already have or until you explain to us

18  why each request is relevant to a theory that you may have

19  based on existing evidence elsewhere, then we will not produce

20  any documents.  That is an inappropriate objection.

21          So if your objection is they have exceeded the scope

22  of Rule 2004, I would like to hear that.

23          MR. SANDLER:  Okay.  Yes, Your Honor.  And I think

24  that really was where our argument was going, which is, first

25  of all, the individual examinees are not direct borrowers.  It

1  is their companies that are borrowers.  So these requests go to

2  personal emails, extensive financial information, bank

3  accounts, et cetera, based on borrowing documents, and they

4  have now told us that they are in possession of records that

5  indicate that there are at least 96 bank accounts to which

6  transfers have been made.  I mean, that is far beyond just the

7  typical fishing expedition.

8           THE COURT:  It is?

9           MR. SANDLER:  They have nothing (indiscernible) --

10          THE COURT:  Mr. Sandler, I have had dozens of cases

11  in my 16 years where 96 bank accounts would be a slender number

12  of bank accounts.  We have massive Ponzi scheme cases.  We have

13  cases involving real estate developers that have more than 96

14  bank accounts.  Why?  Because they transfer the funds through a

15  web of transactions to make it as difficult as possible for

16  anyone to trace where the money went.  That's why they're

17  asking for information from 96 bank accounts.

18          If you have 96 bank accounts, then one would question

19  why you need 96 bank accounts.  And I'm sure they're about to

20  tell me that they're concerned that the money borrowed has gone

21  through multiple phases of transfers.  How do you trace that

22  unless you have access to the bank records?

23          MR. SANDLER:  Okay.  I understand, Your Honor.

24          THE COURT:  I'm not very sympathetic to, we have a

25  lot of bank accounts and we don't think we should have to tell

1  you about them.  So how else have they exceeded the scope of
2  Rule 2004?

3          MR. SANDLER:  I think the other part of it is, in
4  particular, the communications.  Again, these are personal --
5  they're asking for personal emails as between Jacob Gitman,
6  Ariel Gitman, and the Klemmings.  Again, this would be invasive
7  and in a typical adversary proceeding, I'm not sure they'd be
8  allowed to get just unlimited discovery like this.  So the fact
9  that they're using 2004 when they certainly have grounds to
10  bring a proceeding it sounds like, then they shouldn't be able
11  to conduct this broad of a discovery through a 2004 when it
12  wouldn't be allowed in --

13          THE COURT:  Isn't the point of Rule 2004 in this
14  context to figure out whether they in fact have claims that
15  would satisfy Rule 11?  So what you're saying is they should
16  just sign a complaint and sue all of your clients before they
17  figure out whether they actually have claims.

18          Your clients actually want to be sued.  Is that what
19  you're telling us?

20          MR. SANDLER:  There are advantages to being subject
21  to typical rules of procedure versus a 2004.  I'm not saying
22  we're inviting litigation.  I'm saying that, before they're
23  granted unlimited access to emails, finances, bank accounts,
24  there should be a proceeding where we can engage in meaningful
25  discovery with guardrails as to their discovery and we be able

1  to serve discovery --

2          THE COURT:  Well, there are there are some guardrails

3  here.  I'm just not seeing them in this particular case yet.

4  But the whole point of this kind of discovery, which we have in

5  many many cases in the Bankruptcy Court, is so that the estate

6  representatives can figure out what claims there are because

7  they don't know where the money went, for example, in many

8  cases.  They don't know who's involved, and the only way to

9  find that out is to trace it through transfers of funds and

10 communications between parties.

11         So your request is that they not be able to figure

12 out whether they have valid claims.  They should put on

13 blinders and just sue all of your clients.  I would think that

14 would be a violation of the rules of ethics, potentially.  So

15 that's what you're asking Counsel to do.  It's not a good

16 argument, Mr. Sandler.  That one is overruled as well.

17         What else do you have?

18         MR. SANDLER:  Well, I mean those are the arguments,

19 Your Honor, and just based on the Court's comments, I recognize

20 the Court is going to --

21         THE COURT:  I'm going --

22         MR. SANDLER:  Well, it sounds like --

23         THE COURT:  I'm going to grant the motion.  But I'm

24 not granting directly the alternative relief.  I'll direct the

25 parties to discuss how the ESI issues will be addressed in this

1  particular case.  If your client, Mr. Sandler, is going to

2  insist that retaining a separate ESI vendor is excessive, will

3  be an excessive cost -- clients, I notice.  There are multiple

4  clients. -- is going to be at excessive cost, then I'm going to

5  want to know several things.

6        One, I will want to see that you have an independent

7  bid from a recognizable provider with experience in the area.

8  Two, I'm going to want to know more about the financial ability

9  of each of your clients, and then I will hear from the

10 representatives of the estates about why they are seeking

11 particular information.  I hope we don't get to that hearing,

12 however.

13       So the motion is granted.  I want to set a second

14 hearing.  In the meantime, I'd like Counsel to have a meet and

15 confer to address how the ESI issues would be addressed.  To

16 make it clear, the motion is request to compel responses to

17 everything.

18       Do you have a proposed deadline?

19       MR. MARTIN:  For the record, Craig Martin, again, for

20 the foreign representatives.

21       I hesitate to say it because it's going to seem

22 unreasonable when I do, but I'll say it and then we can talk

23 about what it should be.

24       THE COURT:  Sure.

25       MR. MARTIN:  We were thinking January 3rd, but that's

1  obviously the first Monday after a couple of holidays.  And the

2  reason I mention that is because we have been pursuing this for

3  quite some time.  That said, Your Honor mentioned --

4          THE COURT:  Is there something happening that causes

5  that to be the right date?  Because, if you told me there was a

6  trigger, but I understand your desire to get response as

7  quickly as possible.  But I am sympathetic to Mr. Sandler and

8  his firm as well.

9          This is the worst time of year --

10          MR. MARTIN:  Yes.

11          THE COURT:  -- to tell people they need to put pedal

12  to the metal.  I know that from your point of view, that has

13  not happened.  I get it.  But I don't think it's appropriate to

14  choose the first week of January.

15          MR. MARTIN:  So what I was then going to suggest is

16  that maybe a week or two after that so that if either things

17  have gone horribly wrong, we have that January 8th date and we

18  can reach out to the Court.  And then, I don't want to

19  accidentally say a weekend, but the 15th, 16th, 17th, somewhere

20  along in there.

21          THE COURT:  Ms. Leonard, do we have hearings those

22  dates?

23          THE CLERK:  Uh-huh.

24          THE COURT:  Which one?

25          THE CLERK:  The 17th is probably going to be gone, so

1 we may have that date available.

2          THE COURT:  Oh, because of that trial?

3          THE CLERK:  Uh-huh.

4          THE COURT:  Oh.  Okay.  So what's after that?

5          For some reason, everybody's going to trial in

6 January.  Although, again, Miss America is gone.  So I don't

7 have to have that one.

8          Ms. Leonard, what else do we have?

9          THE CLERK:  The 24th.

10          THE COURT:  The 24th.  So please tender an order

11 granting the motion on the motion to compel component directing

12 Counsel to meet and confer with regard to how ESI issues will

13 be addressed and having a continued hearing on the 24th of

14 January at, what time, Ms. Leonard?

15          COURTROOM DEPUTY:  Whatever time they want.  It's

16 (indiscernible).

17          THE COURT:  Let's put it in the afternoon.

18          MR. MARTIN:  All right.

19          THE COURT:  1:30?  Yeah, 1:30.

20          COURTROOM DEPUTY:  Yeah.

21          MR. MARTIN:  And I'll be guided by Ms. McLemore, but

22 I assume that Mr. Sandler will want to look at that order.  I

23 don't know what the practice is, whether we circulate it to him

24 and certify to the Court that we've done so or whether, when we

25 upload it, you just assume that we have done so.

1          THE COURT:  Well --

2          MR. MARTIN:  But I don't want to misstep anything

3    that you would expect normally.

4          THE COURT:  What I expect is that you just won, and

5    in my view, you can show Mr. Sandler the order, but he does not

6    have to agree to it.

7          MR. MARTIN:  Okay.

8          THE COURT:  And then you can send it in.

9          MS. McLEMORE:  Thank you, Your Honor.

10          MR. MARTIN:  All right.

11          THE COURT:  Thank you.

12          MR. MARTIN:  Thank you, Your Honor.

13          THE COURT:  All right.  Anything else?

14          Yes, Ms. Leonard?

15          THE CLERK:  Check you message.

16          THE COURT:  Just a moment.

17          MR. MARTIN:  He's checking a message.

18          THE COURT:  Okay.  So this is the matter I heard

19    earlier today.

20          THE CLERK:  Yes.

21          THE COURT:  Yes.  We have something scheduled on the

22    28th of January.  Can we put ECF 47 on the 22nd at 2:00?

23          Yes, let's do that.

24          THE CLERK:  Okay.

25          THE COURT:  So did we just --

1          MR. MARTIN:  Those comments were not in relation to
2     the case that I'm standing before Your Honor on.  That was an
3     earlier -- or it is?
4          THE COURT:  No, it is this case.  It's, in fact,
5     Mr. Klemming's motion.
6          MR. MARTIN:  Right.  Okay.  So you want both of those
7     on the same day?  Is that what Your Honor is saying?
8          THE COURT:  Yes.  Well, apparently we have another
9     hearing on the date that it was -- did you already change the
10    notes, Ms. Leonard --
11         THE CLERK:  No.
12         THE COURT:  -- on 47?
13         THE CLERK:  No.  So we have a motion calendar.
14         UNIDENTIFIED SPEAKER:  I did.
15         THE COURT:  You did.  Okay.  Thank you.
16         MR. MARTIN:  Ah, okay.
17         THE CLERK:  Yeah.  We have confirmation on the 28th
18    already scheduled, so it would conflict.  We have a regular
19    motion calendar on the 22nd.
20         THE COURT:  Put it then.
21         THE CLERK:  So we can put it then.  And then, this
22    second motion, we're putting on that Friday, right?  We're
23    not -- it's a special set.
24         THE COURT:  No.
25         THE CLERK:  Oh.  So we'll put everything on the 22nd?

1              THE COURT:  Well, I don't want -- nothing is a

2  special set --

3              THE CLERK:  Okay.

4              THE COURT:  -- yet in this.

5              Okay.  So you chose a Friday?

6              THE CLERK:  Yes.

7              THE COURT:  No.  Choose a Wednesday.

8              THE CLERK:  The 22nd.  Everything is going on the

9  22nd.

10             THE COURT:  All right.

11             MR. MARTIN:  And so for clarity, and for Mr. Marks,

12 who may --

13             THE COURT:  Who is not here anymore.

14             MR. MARTIN:  -- have dropped off, that's going to be

15 the 22nd.  So we will let him know that and make sure --

16             THE COURT:  Ms. Leonard will let him know.

17             THE CLERK:  I'll reach out.

18             MR. MARTIN:  Okay.  You'll let him -- all right.

19 Thank you.

20             THE COURT:  Okay.

21             MR. MARTIN:  And then, this matter will also be set

22 for the same day.

23             THE COURT:  Correct.  Yes.  It's on a --

24             MR. MARTIN:  The 22nd in the afternoon.

25             THE COURT:  It will be a motion calendar,

1  Ms. McLemore.

2        MR. MARTIN:  Right.  I believe that's 1:30 is your

3  normal motion calendar?

4        THE COURT:  Yes.

5        MR. MARTIN:  Yeah.

6        THE COURT:  Anything else?

7        MR. MARTIN:  No, other than to thank Your Honor for

8  the time.  I know we put a lot of paper in front of you, and I

9  appreciate you going through it and taking the time to rule on

10 the matters presented today.

11        THE COURT:  All right.  That's my job.  I like it.

12        All right.  Anything else in this case today?

13        MR. MARTIN:  No.

14        THE COURT:  Okay.  Good.

15        We are in recess until 1:30.

16        THE CLERK:  We have to --

17        THE COURT:  Oh, we have what?

18        THE CLERK:  -- go back.

19        THE COURT:  Oh, we have to go back to the other case.

20 Yes.  I apologize.  We're not in recess yet.

21        MR. MARTIN:  I'm going to excuse myself.

22        THE COURT:  Of course.

23        MR. MARTIN:  With the Court's permission, if that's

24 all right.

25        THE COURT:  Please.

44

1          (Proceedings concluded at 11:06 a.m.)

2

**C E R T I F I C A T I O N**

I, Karen K. Watson, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


/s/ Karen Watson                    DATE:  December 20, 2024
KAREN WATSON, AAERT CET-1039

J&J COURT TRANSCRIBERS, INC.